429 So.2d 691 (1983)
John O'CALLAGHAN, a/K/a Jack McCarthy, Appellant,
v.
STATE of Florida, Appellee.
No. 60704.
Supreme Court of Florida.
February 10, 1983.
Rehearing Denied April 27, 1983.
*692 William B. Seidel of the Law Office of William B. Seidel, Fort Lauderdale, for appellant.
Jim Smith, Atty. Gen., and Stewart J. Bellus and Russell S. Bohn, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Appellant, John O'Callaghan, was convicted of murder in the first degree in a joint trial with Walter Tucker, his codefendant, who was found guilty of second-degree murder. The trial judge imposed the death sentence upon appellant in accordance with the jury's advisory sentence recommendation. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction and the imposition of the death sentence.
The following are the necessary facts for a determination of the issues in this cause. In November, 1980, appellant, John O'Callaghan, and his codefendant, Walter Tucker, were charged in a single indictment with the premeditated shooting death of Gerald Vick. This crime culminated a series of events that began in the summer of 1980 with a poker game in which James Long lost several thousand dollars to codefendant Tucker. Long was part-owner, along with his stepson, Alan Wheatley, of the Finish Line Bar. Long apparently hired the victim, Gerald Vick, to act as his bodyguard, *693 furnishing Vick with a car and an open tab at the Finish Line Bar. During the week prior to August 20, 1980, the date Vick was killed, someone shot the windows out of Tucker's house. Tucker came to believe that his windows were broken by Vick acting on Long's behalf. Tucker told appellant O'Callaghan, whom Tucker knew casually and who worked at the Finish Line Bar, that he (Tucker) wanted to find Vick and talk to him about the incident. On the afternoon of August 20, O'Callaghan asked Wheatley to take him, Tucker, Cyndi LaPointe (Tucker's girlfriend), and another man to Vick's home. Of the group, only Wheatley knew at the time where Vick lived. After Wheatley drove the group to Vick's trailer, O'Callaghan went to the door, leaving a note when there was no response to his knock; they all then returned to the bar. According to Wheatley's testimony, O'Callaghan was armed during this episode.
At seven o'clock that evening, Wheatley and O'Callaghan were at the Finish Line Bar, together with Mark Peptitas, an employee of the bar, Leslie, the barmaid, and a customer whose identity was not known. Vick came into the bar and spoke with O'Callaghan briefly. O'Callaghan left the Finish Line. As he left, he met a young woman named Terry Barber. O'Callaghan asked Ms. Barber to go to his apartment and to tell Anthony Cox, a casual acquaintance of O'Callaghan who was temporarily living in his apartment, to come to the Finish Line Bar.
O'Callaghan continued across the street to the bar owned by Cyndi LaPointe, where he found Tucker and Ms. LaPointe. O'Callaghan told Tucker that Vick was at the Finish Line. Tucker, O'Callaghan, and Ms. LaPointe went back across the street and met Cox outside the Finish Line. O'Callaghan told Cox to go inside and get a gun from Peptitas. When Peptitas refused to give Cox the gun, O'Callaghan went in, got the gun, returned outside, and gave the gun to Cox. O'Callaghan told Tucker and Ms. LaPointe to wait a few minutes, then to follow him into the bar.
O'Callaghan and Cox went into the Finish Line and joined Vick at a booth in the rear of the bar. According to the testimony of both Peptitas and Cox, O'Callaghan held a gun on Vick and told Cox to take Vick's gun. Cox did so. Tucker and LaPointe entered the bar. Peptitas and O'Callaghan testified that Tucker went to the booth and held a gun at Vick's head, threatening to blow his brains out, whereupon O'Callaghan told Tucker to calm down. Tucker and Cox both disputed this testimony, stating that, when Tucker entered the bar, O'Callaghan, Cox, and Vick were moving towards the kitchen in the rear of the bar, and that Tucker joined them in the kitchen. In any event, the four men went into the bar's kitchen.
The testimony varies regarding the events which took place in the kitchen. Cox stated that Tucker held a gun in his hand, shouted at Vick about breaking his windows, and hit and kicked Vick several times. O'Callaghan also testified that Tucker hit Vick repeatedly, but Tucker claims to have hit Vick only once, knocking him down, and to have kicked him once as he tried to stand up. Both Tucker and O'Callaghan agreed that Cox "jumped up and down" on Vick, viciously, numerous times. All three men confirmed that Vick lay motionless on the floor of the kitchen after the beating.
O'Callaghan obtained the keys to a white van, used for errands by the bar's employees, from Wheatley. LaPointe was summoned to the kitchen by Tucker, where she saw Vick lying on the floor. The van was drawn up to the back door of the kitchen. O'Callaghan and Cox carried Vick to the van. O'Callaghan, Cox, Tucker, and LaPointe got into the van; O'Callaghan drove for about thirty minutes to an isolated area. Cox was in the back of the van, while Tucker and LaPointe sat up front in the passenger seat. Cox stated that Vick was motionless during the entire trip and showed no signs of life. LaPointe, however, asserted that, when she glanced back at Vick, she thought she saw signs of breathing and leg movement. On the way, they apparently stopped and bought roses.
*694 When the group reached the end of a dirt road, O'Callaghan and Cox threw Vick out of the van. He landed on his face on the ground. Everyone agreed that Vick was then shot: Tucker, Cox, and LaPointe testified that they either saw O'Callaghan shoot Vick in the head or saw him with a gun in his hand immediately after hearing two shots. They further stated that O'Callaghan gave the gun to Tucker and told him to shoot Vick, but that Tucker never fired a shot because the gun jammed. Tucker testified that he was afraid of O'Callaghan and intentionally caused the gun to jam because he did not want to shoot Vick.
O'Callaghan testified in his own behalf, refuting the statements of his codefendant, Tucker. He testified that Tucker fired the first two shots and handed the gun to Cox, who shot Vick once. O'Callaghan asserted that Tucker then directed him to shoot Vick, that he could not because the gun was out of ammunition, but that he would have shot Vick because he was afraid of Tucker and Cox.
Tucker, Cox, and LaPointe all agree that O'Callaghan and Cox dragged Vick's body into the bushes and that O'Callaghan placed two roses on the body. The group returned to the Finish Line Bar and, on the trip back, O'Callaghan threw the gun used to shoot Vick into a canal. Later that night, O'Callaghan and Wheatley arranged for Vick's car to be removed from the vicinity of the bar.
The body of the victim was not discovered until almost a month later, on September 15, at which time it was severely decomposed. The assistant medical examiner, testifying for the state, stated that within reasonable medical certainty Vick's death was caused by two gunshot wounds, one having entered the back of the head and exited the front, and the second having entered the back with the bullet lodging in the chest cavity. The medical examiner, during cross-examination, said that the physical beating, in his opinion, was not the cause of death although it was a remote possibility. A pathologist for the defendant testified that, after review of the autopsy report, the depositions, and the photographs of the victim, in his opinion, it could not be determined with certainty that the shooting was the cause of death.
Prior to the trial, the accomplice, Cox, was granted immunity; this fact was made known to the jury. The jury returned verdicts of second-degree murder against codefendant Tucker and of first-degree premeditated murder against appellant O'Callaghan. After the sentencing hearing, the jury recommended the imposition of the death sentence for O'Callaghan. The trial judge imposed the death sentence, finding as aggravating circumstances that: (1) appellant O'Callaghan had been previously convicted of a felony involving the use of violence to a person; (2) appellant O'Callaghan was engaged in a kidnapping at the time of the crime for which he was being sentenced; (3) the crime for which appellant was sentenced was especially heinous, atrocious, or cruel; and (4) the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The trial judge found that no mitigating circumstances existed to outweigh the aggravating circumstances.

Trial Phase
Appellant contends that his conviction should be set aside because: (1) the trial judge abused his discretion in denying appellant's motion to sever his trial from that of codefendant Tucker; (2) the indictment was insufficient either to apprise him of specific nature and details of the crime he was charged with having committed or to serve as a basis for the trial judge's instructions to the jury on felony murder; and (3) the trial judge abused his discretion by allowing the prosecutor, both during the trial and in final argument, to make certain remarks which were prejudicial to appellant. For the following reasons, we find none of these alleged errors requires a reversal of the conviction.
Regarding his first point, appellant asserts that the trial court was required to sever his trial from that of his codefendant, *695 Tucker, under our decisions in Crum v. State, 398 So.2d 810 (Fla. 1981), and Menendez v. State, 368 So.2d 1278 (Fla. 1979). He contends that his defense and Tucker's defense were antagonistic so that his right to receive a fair trial was prejudiced because Tucker testified and placed the major blame for the murder on appellant. O'Callaghan further argues that he had no desire to testify and did not decide to testify until he heard Tucker accuse him of being principally responsible for this murder.
Appellant is essentially arguing that severance should be mandatory whenever two codefendants blame each other for the crime. As we explained in our recent decision in McCray v. State, 416 So.2d 804 (Fla. 1982), such a rule would be clearly contrary to the existing majority rule of law on this point. We stated in McCray:
The object of the [severance] rule is not to provide defendants with an absolute right, upon request, to separate trials when they blame each other for the crime. Rather, the rule is designed to assure a fair determination of each defendant's guilt or innocence. This fair determination may be achieved when all the relevant evidence regarding the criminal offense is presented in such a manner that the jury can distinguish the evidence relating to each defendant's acts, conduct, and statements, and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence. The rule allows the trial court, in its discretion, to grant severance when the jury could be confused or improperly influenced by evidence which applies to only one of several defendants.
.....
... If the defendants engage in a swearing match as to who did what, the jury should resolve the conflicts and determine the truth of the matter.
Id. at 806. Appellant was not entitled to severance in this instance. He had an opportunity to confront and cross-examine fully the witnesses, and there was no confusing or improper evidence submitted to the jury in this joint trial. Our decision in Crum is distinguishable and is not applicable for the same reasons as we expressed in McCray. Tucker did not give a statement to appellant's counsel prior to trial and then change his story, he simply decided to testify in his own behalf. Appellant was, therefore, not induced to rely on any statement of Tucker's in the formulation of his defense. Further, appellant freely chose to offer his own testimony after Tucker testified. An accused's decision to testify is unrelated to a determination of the propriety of severance. We find that the trial judge properly exercised his discretion in denying the motion for severance.
The second issue raised by appellant relates to the sufficiency of the indictment. Appellant asserts that he was tried for both premeditated and felony murder, but was not charged by indictment with felony murder. We have previously expressly stated that "the state does not have to charge felony murder in the indictment but may prosecute the charge of first-degree murder under a theory of felony murder when the indictment charges premeditated murder." State v. Pinder, 375 So.2d 836, 839 (Fla. 1979). See also Knight v. State, 338 So.2d 201 (Fla. 1976).[*] Appellant, because of our reciprocal discovery rules, had full knowledge of both the charges and the evidence that the state would submit at trial. This is much more information than he would have received in almost any other jurisdiction, federal or state. We conclude that appellant was not prejudiced by the manner in which he was charged in the indictment or by the instructions given to the jury on the crime as charged in the indictment.
Appellant's third point concerns two separate comments made by the prosecutor during the trial. In the first instance, the record reflects that the following took place during appellant's testimony in the trial *696 phase, while he was testifying about his presence at the crime scene with the police:
Q. Did you in any way try to assist in finding the gun?
A. Yes, I did. I tried to assist in finding the bullet, but no metal detector was brought out there. The bullets were  assumed that they were found  if Judge here, Mr. Coker stipulated that there would be a metal detector. When we got out there, there wasn't one.
MR. GARFIELD: Judge, I object.
THE WITNESS: When we got out there the prosecutor said, "Did you bring your metal detector?"
MR. GARFIELD: That's a lie. I would like to go to the bench.
There was an objection, which was sustained, and a curative instruction was given by the trial judge, who also denied a motion for a mistrial.
The comment of the prosecutor was unquestionably improper. Any trial lawyer should know that this type of conduct is completely beyond the limits of propriety. It is even more incomprehensible that the Assistant Attorney General would state in his brief that "the prosecutor's short statement, `That's a lie,' was the only way to impeach O'Callaghan's lie which attributed negative motives to the prosecutor and overall State investigation." The state further asserted in its brief that "[i]f the State wished to rebut O'Callaghan's false inferences, the prosecutor would have had to become a witness," and that the prosecutor's comment was the only alternative "[s]hort of replacing himself as lawyer for the State." The clear position of the state is that this comment was a permissible alternative means of impeaching a witness. This argument is completely without merit. We do find, however, that this testimony and the prosecutor's comment concerned a collateral matter which was not critical to the issues actually tried in this cause. Because of the overwhelming evidence of appellant's guilt, we are able to find that appellant was not prejudiced by the prosecutor's uncalled-for behavior.
The second assertedly improper comment was made in the final arguments when the prosecutor called appellant's expert pathologist a "prostitute." No objection was made to these comments at the time, nor was there a motion for a curative instruction or a motion for a mistrial. The error, if any, was waived. See State v. Cumbie, 380 So.2d 1031 (Fla. 1980); Clark v. State, 363 So.2d 331 (Fla. 1978).
We find that none of these issues, either individually or collectively, require reversal of the conviction. Further, we conclude that the evidence is sufficiently overwhelming to properly apply the harmless-error rule of Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). For these reasons, the conviction must be affirmed.

Sentencing Phase
Appellant asserts, as his final point, that the trial court used two improper aggravating factors to justify the imposition of the death sentence, specifically (1) that O'Callaghan committed this crime while engaged in a kidnapping, and (2) that the crime was heinous, atrocious, and cruel. We disagree with appellant's contention that, given the totality of the circumstances, the trial court erroneously found that this crime was committed by appellant while he was engaged in a kidnapping. The victim was forced from the public area of the Finish Line Bar into the kitchen, where he was severely beaten. While unconscious, he was taken to an isolated area and shot twice. Neither of these two instances of transporting the victim was inherent in or necessarily required in the commission of the murder. The trial court's conclusion that the murder was committed during the course of a kidnapping was proper under the rule announced in Faison v. State, 426 So.2d 963 (Fla. 1983) (on rehearing). We also find that the acts of brutality committed against the victim, the beating and the manner in which the beating was carried out, together with the actual killing, justify a finding of heinous, atrocious, and cruel.
*697 The trial judge correctly found two additional aggravating factors in determining appellant's sentence. O'Callaghan had previously been convicted of robbery with violence. Further, the record supports the trial judge's finding that this killing was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification since this was unquestionably an execution killing. Appellant apparently concedes that there are no mitigating circumstances.
We conclude that the aggravating circumstances justify the affirmance of the death sentence in this cause, and we note that the sentence was in conformity with the jury recommendation. The jury in this case heard the testimony of all those involved in Vick's death and knew that LaPointe was not charged and that Cox had received immunity. The jury had a full opportunity to evaluate the evidence presented and allocate each participant's responsibility for this crime. In our opinion, under the evidence presented, the jury could reasonably determine that the codefendant, Tucker, was guilty only of second-degree murder, while the appellant, O'Callaghan, was guilty of first-degree murder and deserved the death penalty.
We find no reversible error in this proceeding, and, accordingly, the conviction and sentence are affirmed.
It is so ordered.
ALDERMAN, C.J., and ADKINS, BOYD, OVERTON and EHRLICH, JJ., concur.
McDONALD, J., dissents with an opinion.
McDONALD, Justice, dissenting.
I dissent. The record does not prove beyond a reasonable doubt that the death of the victim, Gerald Vick, was caused by O'Callaghan's firing two shots into the body of Vick.
Vick had been brutally beaten, kicked, and stomped upon in the kitchen of the Finish Line Bar. He had lost a large amount of blood and was clearly unconscious when he was wrapped in plastic and placed in the van driven by O'Callaghan. The only possible evidence that there was any life in Vick while being transported was a statement by the female, LaPointe, when she said, "I did see him move. I saw his leg move and it looked as if he was breathing, but you know, I can't swear to it. I looked back and turned back around fast." No one else saw any sign of life in Vick. O'Callaghan's testimony that Vick was dead when placed in the van is disputed only by the testimony of LaPointe.
On appellate review we do not indulge in judging the credibility of witnesses; nevertheless, even that possibly truthful statement of LaPointe is insufficient to prove that Vick was alive when he reached the end of his journey. There is ample evidence that O'Callaghan fired shots into Vick's body, and it is logical to question why this was done if Vick was no longer living. This may be sufficient to raise a doubt in favor of the state on this issue, but is still inadequate to prove beyond a reasonable doubt that the shooting killed him when there is strong evidence to the contrary.
I do not say that O'Callaghan cannot be convicted of some degree of homicide for his actions at the bar involving Vick, but he was obviously convicted for shooting him, and on that basis the conviction is not adequately proved.
Apart from this deficiency I would grant O'Callaghan a new trial because actions of the prosecutor precluded a fair trial and the jury's impartial consideration of the facts. Lawyers cannot present testimony or submit facts to the jury via open courtroom comment or statements to the jury in argument. In this case the prosecutor transgressed this rule and violated fair prosecutorial presentation on two occasions. First, he disputed a factual statement of the defendant by saying, "That's a lie," while cross-examining him. Second, in an effort to discredit a witness called by the defendant on the cause of death, a critical defense of this defendant, he told the jury, "Now on the other hand you have Dr. Fatah and you can reject what I am about to say because *698 it is just a statement of an attorney and it is not evidence, but I submit to you that Dr. Fatah is a prostitute." (Emphasis supplied). That comment is unexplainable and was prejudicial. The prefatory phrase made it no less damning to have an officer of the state, without any other evidence to base it upon, telling the jury that the defense witness sold his testimony. The state deserves better from its officers; when a transgression is this substantial, a new trial should be granted, with or without an objection. If improper remarks are of such character that neither rebuke nor retraction may entirely destroy their sinister influence, a new trial should be awarded regardless of the want of objection or exception. Carlile v. State, 129 Fla. 860, 176 So. 862 (1937).
NOTES
[*] Both Pinder and Knight have been modified on other grounds by State v. Hegstrom, 401 So.2d 1343 (Fla. 1981).