642 So.2d 730 (1994)
Lancelot ARMSTRONG, Appellant,
v.
STATE of Florida, Appellee.
No. 78180.
Supreme Court of Florida.
August 11, 1994.
Rehearing Denied September 29, 1994.
*732 Richard L. Jorandby, Public Defender and Jeffrey L. Anderson, Asst. Public Defender, West Palm Beach, for appellant.
*733 Robert A. Butterworth, Atty. Gen. and Celia A. Terenzio, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Lancelot Armstrong appeals his convictions of robbery, attempted first-degree murder, and first-degree murder and his sentences of life imprisonment for the robbery and attempted first-degree murder convictions and death for the first-degree murder conviction. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm Armstrong's convictions and sentences.
The record reflects the following facts. In the early morning hours of February 17, 1990, Armstrong called a friend and asked him to go with him to rob Church's Fried Chicken restaurant. The friend refused. According to several employees of Church's, around two o'clock that same morning, Armstrong and Michael Coleman came to the restaurant asking to see Kay Allen, who was the assistant manager of the restaurant and Armstrong's former girlfriend. The restaurant employees testified that Allen did not want to see Armstrong and asked him to leave. Armstrong and Coleman, however, remained at the restaurant and eventually Allen accompanied Armstrong to the vehicle he was driving while Coleman remained inside the restaurant. The employees additionally testified that Allen and Armstrong appeared to be arguing while they were sitting in the vehicle.
Allen testified that, while she was in the car with Armstrong, he told her he was going to rob the restaurant, showed her a gun under the seat of the car, and told her he might have to kill her if she didn't cooperate. Coleman then came out to the car, and Armstrong, Coleman, and Allen went back into the restaurant. Allen was responsible for closing the restaurant, and by this time, the other employees had left. Coleman and Armstrong ordered Allen to get the money from the safe. Before doing so, she managed to push the silent alarm. Shortly thereafter, Armstrong returned to the car. Coleman remained in the restaurant with Allen to collect the money from the safe.
Other testimony reflected the following facts. When the alarm signal was received by the alarm company, the police were notified and Deputy Sheriffs Robert Sallustio and John Greeney went to the restaurant where they found Armstrong sitting in a blue Toyota. Greeney ordered Armstrong out of the car and told him to put his hands on the car. After Greeney ordered Armstrong to put his hands on the car, Greeney holstered his gun to "pat down" Armstrong. Sallustio then noticed movement within the restaurant, heard shots being fired from the restaurant and from the direction of the car, and felt a shot to his chest. Apparently, when the movement and shots from the restaurant distracted the officers, Armstrong managed to get his gun and began firing at the officers.
According to Allen, when Coleman noticed that police officers were outside the building, he started firing at the officers. Allen took cover inside the restaurant, from where she heard Coleman firing more shots and heard a machine gun being fired outside the restaurant. Sallustio was shot three times, but still managed to run from Armstrong and radio for assistance. When other officers arrived, they found Greeney dead at the scene. Greeney had died instantly. Allen was found inside the restaurant; Coleman and Armstrong had fled.
That same day, Armstrong told one friend that he got shot and that he returned a shot; he told his girlfriend that a police officer had asked him to step out of his car and that, when he did so, the officer pulled a gun on him and tried to shoot him; and he told another friend that someone shot him while trying to rob him. Thereafter, Armstrong and Coleman fled the state but were apprehended the next day in Maryland. Before being apprehended, Armstrong had two bullets removed from his arm by a Maryland doctor.
A number of shell casings were recovered from the scene. All of the bullets removed from Sallustio and Greeney were fired from a nine-millimeter, semi-automatic weapon; Greeney had been shot from close range. Evidence reflected that Armstrong had purchased *734 a nine-millimeter, semi-automatic weapon the month before the crime. Armstrong's prints were found in the blue Toyota as well as on firearm forms found in the car. Additional ballistics evidence reflected that the shots fired from the restaurant did not come from a nine-millimeter, semi-automatic weapon. This indicated that only someone near the car could have fired the shots that wounded Sallustio and killed Greeney. Additionally, testimony was introduced to show that Armstrong was seen with a nine-millimeter, semi-automatic gun right after the incident. Armstrong was convicted as charged.[1]
At the penalty phase, the State presented evidence showing Armstrong's prior conviction of indecent assault and battery on a fourteen-year-old child. Armstrong presented evidence from a number of witnesses in support of the following nonstatutory mitigating circumstances: (1) he had significant physical problems during childhood (he was dyslexic but a good student and had a brain hemorrhage when he was a baby); (2) helped others and had a positive impact on others (routinely assisted his grandmother, brothers and sisters, both financially and emotionally; was a good father and provider to his son; trained others to do carpentry work and was a positive influence on those he assisted); (3) was present as a child when his mother was abused and would come to her aid; (4) could be productive in prison (was an excellent carpenter and plumber); (5) is a good prospect for rehabilitation; (6) codefendant received a life sentence; (7) the alternative sentence is life imprisonment without the possibility of parole; (8) Armstrong is religious (attends church); and (9) Armstrong failed to receive adequate medical care and treatment as a child (had a brain hemorrhage when he was a baby but, due to finances, did not receive the medical attention he needed).
The jury recommended death by a nine-to-three vote. The trial judge found no statutory mitigating circumstances and four aggravating circumstances: (1) prior conviction of a violent felony; (2) committed while engaged in the commission of a robbery or flight therefrom; (3) committed for the purpose of avoiding arrest or effecting an escape from custody; and (4) murder of a law enforcement officer engaged in the performance of official duties. The trial judge sentenced Armstrong to death for the murder of Officer Greeney, to life imprisonment for the attempted murder of Officer Sallustio, and to life imprisonment for the armed robbery.
Armstrong raises a total of twenty-four issues in this appeal, nine of which pertain to the guilt phase of the trial and fifteen of which pertain to the penalty phase proceeding.[2]

*735 Guilt Phase

In his first conviction issue, Armstrong contends that a new trial is required because Kay Allen lied about material facts at trial. During the course of the trial, Kay Allen mentioned that she became pregnant with twins during the time she was dating Armstrong but that he was not the father of the twins. She also stated that, when she was in the car with him outside the restaurant on the night of the incident, he showed her the nine-millimeter, semi-automatic machine gun and threatened her with the gun. After the trial, Allen underwent a blood test, which determined that Armstrong was the father of the twins. She also began communicating with Armstrong in prison.
Thereafter, at the hearing on a motion for new trial, Allen testified that she had lied at trial about Armstrong's not being the father of the twins. Additionally, she testified that she thought Armstrong was innocent, that Armstrong never threatened her, and that she never actually saw the gun but knew it was there because she "heard" it and knew that Armstrong always kept it under the seat. She additionally testified that she had mentioned to people in the prosecutor's office that Armstrong might be the father of the twins, but that they "went around it or something."
To rebut Allen's change in testimony, the prosecutor introduced testimony reflecting that Allen did mention to the victim-assistance counselor that Armstrong might, in fact, be the father of the twins, but that she did not do so until after the trial. The counselor advised her to get a blood test done to determine the identity of the twins' father. Additionally, testimony was introduced to show that Allen's statements at trial regarding the gun and Armstrong's behavior on the night of the incident were almost identical to the statements she had given to law enforcement officers immediately after the incident. They were also almost identical to the statements that she later gave to other officers and that she made during discovery.
Armstrong argues that Allen's change in testimony warrants a new trial because her testimony was crucial to the State's case-in-chief given that it was the only testimony that placed the murder weapon in Armstrong's possession during the robbery. Additionally, Armstrong contends that a new trial is warranted because a material misstatement in the testimony of a prosecution witness constitutes grounds for a new trial.
Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. Brown v. State, 381 So.2d 690 (Fla. 1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981); Bell v. State, 90 So.2d 704 (Fla. 1956). In determining whether a new trial is warranted due to recantation of a witness's testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. Bell. "Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury." Id. at 705 (quoting Henderson v. State, 135 Fla. 548, 561, 185 So. 625, 630 (1938) (Brown, J., concurring specially)). Only when it appears that, on a new trial, the witness's testimony will change to such an extent as to render probable a different verdict will a new trial be granted. Id. When taking the evidence of this case as a whole, we find that the trial judge correctly denied Armstrong's motion for a new trial. Allen's testimony was consistent from the time of the incident to the conclusion of the trial. Her testimony did not change until she found through a blood test that Armstrong was the father of her twins and until she began communicating with him after the trial. Additionally, even without her testimony, sufficient testimony exists to support, beyond a reasonable doubt, Armstrong's conviction, and it is not probable that a different verdict would be reached if Allen's change of testimony *736 were to be introduced at a new trial. Consequently, we deny this claim.
In his second claim, Armstrong alleges that the State elicited inadmissible evidence under the guise of refreshing a witness's recollection. Specifically, Armstrong contends that a witness for the State testified that Armstrong never mentioned shooting a police officer; that over Armstrong's objection and under the guise of refreshing the witness's memory, the State presented the witness with the witness's previous statement to the contrary; and that the witness then stated that the statement did not refresh her memory and that she did not remember stating previously that Armstrong told her he shot a police officer. Armstrong asserts that it was error for the prosecutor to reveal the contents of the statements used to refresh recollection and for the prosecutor to ask the witness if her out-of-court statement indicated that Armstrong had said he shot an officer. The record indicates, however, that it was the witness who revealed the contents of the prior statement. First, after the witness gave her version of Armstrong's behavior after the incident, the prosecutor asked the witness if she had said anything else about his behavior in earlier statements. The witness then replied, "I probably did but right now that's what I remember." At that point, the prosecutor properly showed the witness her prior statement and asked if the statement refreshed her memory. Thereafter, the witness stated, "I don't remember saying that he said that he shot the police officer." Because the prosecutor was properly attempting to refresh the witness's memory and because it was the witness and not the prosecutor who revealed the contents of the prior statement, we find no misconduct on the part of the prosecutor.
In his third claim regarding the conviction, Armstrong argues that the trial judge erred in refusing to allow an in camera review of the testimony that was provided to the grand jury. A review of the record reveals that the trial judge did allow Armstrong access to some of the grand jury testimony (see the next issue below), but that Armstrong failed to establish a predicate that the remaining grand jury testimony contained material evidence and failed to advise the court as to the possible usefulness of the grand jury testimony. Consequently, we deny this claim.
Next, Armstrong contends that the trial judge erred in allowing Officer Sallustio to testify at trial that Armstrong was the person who chased him because Sallustio's identification was tainted and the facts that he gave regarding the identification were different at trial from what he previously told the grand jury. The record reflects that Sallustio testified before the grand jury shortly after the incident. At that time, he was still hospitalized and was still taking medication. At the trial, he acknowledged that his testimony varied somewhat from what he told the grand jury. He stated that directly after the incident he could recall only a few details about the crime; however, as time passed his memory of the incident improved. Consequently, the jury was aware that his testimony had changed and the credibility of Sallustio's testimony was an issue for the fact-finder. Moreover, clear, direct evidence unquestionably places Armstrong at the restaurant on the night of the crime and physical evidence supports a finding that Armstrong fired the fatal shots. Therefore, we find this claim to be without merit.
In his fifth guilt-phase issue, Armstrong argues that hearsay evidence regarding the robbery was erroneously admitted at trial. At trial, Kay Allen was allowed to testify that Coleman ordered her to open the safe. We find this testimony was properly admitted as a verbal act forming the basis of Allen's subsequent action in opening the safe and pulling the alarm. See, e.g., Zeigler v. State, 402 So.2d 365 (Fla. 1981) (testimony as to the conversation represented verbal act which formed basis for witness's subsequent action in securing revolvers and delivering them), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982).
Armstrong also asserts that the State was erroneously allowed to elicit testimony from a witness that Armstrong told her, over a year before the shooting, that he hated police officers. According to Armstrong, this was impermissible bad character evidence, *737 was irrelevant to whether he committed the crime at issue, and requires a new trial. We find that this testimony was relevant and properly admitted to show Armstrong's state of mind to prove or to explain subsequent behavior. Jackson v. State, 498 So.2d 406 (Fla. 1986), cert. denied, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987); State v. Escobar, 570 So.2d 1343 (Fla. 3d DCA 1990), dismissed, 581 So.2d 1307 (Fla. 1991).
Next, Armstrong contends that the instruction the trial judge gave to the jury on reasonable doubt denied Armstrong due process and a fair trial. No objection was made to this instruction at trial and, as such, this claim is procedurally barred. Moreover, we recently rejected this same claim in Esty v. State, 642 So.2d 1074 (Fla. 1994), in which we specifically found the instruction at issue to be constitutional.
Armstrong also argues that the trial judge erred in allowing the State to proceed on a felony-murder theory when the indictment gave no notice of the theory. This claim has been repeatedly rejected by this Court. Lovette v. State, 636 So.2d 1304 (Fla. 1994) (an indictment charging only premeditated murder is sufficient to allow the State to proceed on either premeditated or felony murder); Bush v. State, 461 So.2d 936 (Fla. 1984), cert. denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986); O'Callaghan v. State, 429 So.2d 691 (Fla. 1983); Knight v. State, 338 So.2d 201 (Fla. 1976).
In his final guilt-phase issue, Armstrong claims that his right to effective assistance of counsel and equal protection was violated because the trial judge refused to appoint two attorneys to represent him in this case. According to Armstrong, because of the complicated nature of this case, he was entitled to more than one attorney. We disagree. Appointment of multiple counsel to represent an indigent defendant is within the discretion of the trial judge and is based on a determination of the complexity of a given case and the attorney's effectiveness therein. Makemson v. Martin County, 491 So.2d 1109 (Fla. 1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 908, 93 L.Ed.2d 857 (1987). We note that, in making his request for co-counsel, Armstrong stated that additional counsel was needed to ensure that the case was properly investigated and to allow one counsel to represent him during the guilt phase and another to represent him during the penalty phase to guarantee a fair trial. In ruling on Armstrong's request, the trial judge specifically stated that another counsel was unnecessary and that Armstrong had been given "almost carte blanche" access to investigators to assist him. We find that the trial judge acted within his discretion in denying Armstrong's request.

Penalty Phase
In his first issue regarding the penalty phase, Armstrong argues that the trial judge formulated his sentencing decision before giving Armstrong an opportunity to be heard in violation of Spencer v. State, 615 So.2d 688 (Fla. 1993). Armstrong admits that he was allowed to present argument of counsel and additional evidence at his sentencing hearing. He argues, however, that the trial judge prepared the sentencing order before the sentencing hearing, and, therefore, that the trial judge had already determined what Armstrong's sentence would be before arguments and evidence were presented.
In Spencer, 615 So.2d at 690, we stated:
In Grossman [v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989)], we directed that written orders imposing the death sentence be prepared prior to the oral pronouncements of sentence. However, we did not perceive that our decision would be used in such a way that the trial judge would formulate his decision prior to giving the defendant an opportunity to be heard. We contemplated that the following procedure be used in sentencing phase proceedings. First, the trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity *738 to be heard in person. Second, after hearing the evidence and argument, the trial judge should then recess the proceeding to consider the appropriate sentence. If the judge determines that the death sentence should be imposed, then, in accordance with section 921.141, Florida Statutes (1983), the judge must set forth in writing the reasons for imposing the death sentence. Third, the trial judge should set a hearing to impose the sentence and contemporaneously file the sentencing order.
In reversing the convictions at issue in Spencer and remanding that case for a new trial, we noted that the trial judge had not followed the sentencing procedure quoted above. The failure of the trial judge to follow that procedure in Spencer, however, was not the sole reason for our reversal in that case. In fact, in Spencer, the trial judge committed numerous errors, including the error of engaging in ex parte communications with the prosecutor regarding Spencer's sentence. We note that our decision in Spencer was decided several years after this case was tried. Further, although, in the instant case, the trial judge may not have followed the procedure we set forth in Spencer, we find no prejudice to Armstrong under the circumstances of this case. Almost all of the arguments and evidence Armstrong presented at the sentencing hearing had previously been heard by the trial judge, either at trial or at the hearing on Armstrong's motion for new trial, or were without merit. Moreover, the record reflects that the trial judge allowed Armstrong an opportunity to present evidence at the sentencing hearing. Additionally, none of the other errors at issue in Spencer are present here. We find that our decision in Spencer  being a change in procedure and not a change in the law  is to be applied prospectively only. We therefore hold that any defendant who was sentenced before our decision in Spencer, and who was provided a full and fair opportunity to present evidence at the sentencing hearing, cannot challenge, absent a showing of prejudice, a sentencing order on the grounds that the trial judge prepared the order before the sentencing hearing. Because the sentencing hearing in this case took place before our decision in Spencer, because Armstrong was provided with a full and fair opportunity to present evidence at the sentencing hearing, and because there has been no showing of prejudice by the fact that the trial judge prepared the sentencing order before providing Armstrong with the opportunity to be heard, we deny this claim.
In his second claim, Armstrong argues that several of the aggravating circumstances in this case are duplicative and that the trial judge should not have disallowed his requested limiting instruction on duplicate aggravating circumstances. Specifically, Armstrong contends that the aggravating circumstances of "committed for the purpose of avoiding arrest" and "murder of a law enforcement officer engaged in the performance of official duties" are duplicative because they are based on the same aspect of the crime; that is, that the law enforcement officer was killed to avoid arrest. Likewise, Armstrong argues that the trial judge should not have found both that the crime was "committed while engaged in the commission of a robbery or flight therefrom" and that Armstrong had a "prior conviction of a violent felony" because the "prior conviction" was based on the contemporaneous robbery.
In this case, the only evidence supporting the "committed to avoid arrest" aggravating circumstance was the fact that the victim was a law enforcement officer. Consequently, we agree that the aggravating factors of "committed to avoid arrest" and "victim was a law enforcement officer" are duplicative because both factors are based on a single aspect of the offense. Armstrong's argument, however, that the "committed while engaged in the commission of a robbery or flight therefrom" and "prior conviction of a violent felony" aggravators are also duplicative is without merit because the record reflects that Armstrong had a previous felony conviction for indecent battery on a fourteen-year-old child.
Because two of the aggravating circumstances in this case were duplicative, Armstrong argues that the trial judge erred in refusing to give the limiting instruction he requested regarding duplicative aggravating circumstances. Castro v. State, 597 So.2d 259 *739 (Fla. 1992). He also contends that, in light of the duplicative factors, the death penalty is not warranted in this case. In Castro, we held that such a limiting instruction was warranted under these circumstances. We note, however, that the trial in this case occurred approximately one year before our decision in Castro. Moreover, at the time of the trial in this case, this issue was governed by Suarez v. State, 481 So.2d 1201 (Fla. 1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2908, 90 L.Ed.2d 994 (1986), in which we determined that the failure to instruct a jury on duplicative aggravating factors is not reversible error when the trial court does not give the factors double weight in its sentencing order. Although the trial judge in this case did give the factors double weight in his sentencing order, we still find that the trial judge's improper doubling of two of the aggravating circumstances and failure to give the limiting instruction were harmless error beyond a reasonable doubt in light of the remaining three valid aggravating circumstances and the negligible mitigating evidence in this case.
Armstrong also contends that the trial judge erred in refusing to find certain nonstatutory mitigating factors and in failing to consider certain nonstatutory mitigating factors in his sentencing order. In his sentencing order, the trial judge stated:
All [eleven] witnesses for the Defendant testified as to a troubled and sickly childhood; and to the extent of the Defendant's assistance to his family members; and to his general good character and religious upbringing.
... .
In summary, the Court finds that of the aggravating circumstances, four were applicable in this case. As to mitigating circumstances, none may be applied to this case.

Based upon the preceding opinions of fact, and it being the opinion of this Court that there are sufficient aggravating circumstances existing to justify the sentence of death, and this Court after weighing the aggravating and mitigating circumstances, being of the additional opinion that no mitigating circumstances exist to outweigh the aggravating [orders that the death penalty be imposed].
(Emphasis added.) From the wording of the trial judge's sentencing order, it is does appear that he sufficiently considered the nonstatutory mitigating evidence presented in this case. He specifically stated that eleven witnesses testified on Armstrong's behalf and he specifically considered the testimony presented by those witnesses. After listing the testimony presented regarding nonstatutory mitigation, the trial judge stated that no mitigating circumstances applied to this case. Given that this statement followed the trial judge's listing of nonstatutory mitigating evidence, it appears that he was stating that no "statutory" mitigating circumstances applied to this case. Further, the trial judge specifically weighed the mitigating evidence against the evidence in aggravation, stating that "no mitigating circumstances exist to outweigh the aggravating" circumstances. Although the trial judge's articulation of how he considered the mitigating circumstances and aggravating circumstances is somewhat less than a model of clarity, we believe that he properly considered all nonstatutory mitigating circumstances in imposing the death sentence. In any event, however, we find that any error was harmless beyond a reasonable doubt because, as indicated above, the three valid aggravating circumstances in this case strongly outweigh the negligible nonstatutory mitigating evidence submitted by Armstrong. Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) (court may conduct a harmless error analysis or reweigh the remaining aggravating and mitigating circumstances even though the court has struck one or more of the aggravating factors).
Armstrong next claims that the death penalty is not warranted in this case because codefendant Coleman received a life sentence. The facts of this case reflect that Armstrong shot Officer Greeney at least four times at close range even through Greeney never removed his gun from his holster to return fire. Further, as stated, the mitigating factors in this case are insufficient to outweigh the aggravating factors. This Court has repeatedly stated that, when the defendant is the shooter, the death penalty is *740 not disproportionate even though a codefendant received a lesser sentence. Mordenti v. State, 630 So.2d 1080 (Fla. 1994), cert. denied, ___ U.S. ___, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994); Downs v. State, 572 So.2d 895 (Fla. 1990), cert. denied, ___ U.S. ___, 112 S.Ct. 101, 116 L.Ed.2d 72 (1991).
In his next claim, Armstrong argues that the trial judge erred in failing to grant his pretrial request for a Magnetic Resonance Imaging (MRI) test to determine whether Armstrong had a brain tumor, a fact which could have been used in mitigation. The record reflects that, at the pretrial competency hearing, four experts testified regarding Armstrong's competency to stand trial: three testified that he was competent to stand trial; one testified that he was incompetent to stand trial because of his inability to read and write and that an MRI might be helpful in identifying this deficit and other defenses. The trial judge reserved ruling on this issue and apparently never issued a ruling. Consequently, this issue is procedurally barred. Richardson v. State, 437 So.2d 1091 (Fla. 1983) (failure to obtain ruling on motion fails to preserve issue for appeal); State v. Kelley, 588 So.2d 595 (Fla. 1st DCA 1991) (same). In any event, the record reflects that Armstrong was provided a reader during the course of the trial and that this issue went to Armstrong's competency to stand trial, and not to the presentation of mitigation.
The remaining issues raised by Armstrong regarding his sentence of death were either not properly preserved for appellate review, have been previously rejected by this Court, or are otherwise without merit.
Accordingly, for the reasons expressed, we affirm Armstrong's convictions of robbery, attempted first-degree murder, and first-degree murder and his sentences of life imprisonment for the robbery and attempted first-degree murder convictions and his sentence of death for the first-degree murder conviction.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] Coleman was tried and convicted separately and received a sentence of life imprisonment.
[2] Regarding the guilt phase, Armstrong claims that: (1) a new trial is warranted because a witness lied about material facts at trial; (2) the State elicited inadmissible evidence under the guise of refreshing a witness's recollection; (3) the trial judge erred in refusing to allow an in camera review of the grand jury testimony; (4) the trial judge erred in denying Armstrong's motion to suppress identification testimony; (5) the trial judge erred in denying Armstrong's objection to hearsay statements introduced into evidence; (6) the trial judge erred by permitting the State to introduce certain character evidence; (7) the jury instruction on reasonable doubt denied Armstrong due process and a fair trial; (8) the trial judge erred in allowing the State to proceed on a felony-murder theory when the indictment gave no notice of the theory; and (9) Armstrong's right to effective assistance of counsel and equal protection was violated by the trial judge's refusal to appoint co-counsel. As to the penalty phase, Armstrong asserts that: (1) the trial judge formulated his sentencing decision before giving Armstrong an opportunity to be heard; (2) & (3) certain aggravating circumstances were duplicative and the trial judge erred in denying Armstrong's requested limiting instruction on duplicate aggravating circumstances; (4) & (5) the trial judge erred in refusing to find certain nonstatutory mitigating factors and in failing to consider certain nonstatutory mitigating factors in its sentencing order; (6) the death penalty is disproportionate in this case; (7) the trial court erred in not granting Armstrong's motion for a magnetic resonance imaging examination; (8) victim impact information was considered by the trial judge in sentencing Armstrong; (9) the trial judge improperly denied Armstrong's request for new counsel; (10) the trial judge erred in denying Armstrong's requested jury instruction that mitigating evidence does not have to be found unanimously; (11) the jury instruction given on sentencing minimized the jury's sense of responsibility, thus depriving Armstrong of a fair sentencing; (12) the trial judge failed to adequately define nonstatutory mitigating circumstances; (13) the trial judge failed to instruct the jury on the correct burden of proof in the penalty phase; (14) Florida's death penalty statute is unconstitutional; and (15) the aggravating circumstances used in this case are unconstitutional.