ROTHENBERG, J.
In his attempt to obtain a new trial on the basis of “newly discovered evidence,” the defendant, Tracy McLin, has fared no better than he did on his 1996 motion for postconviction relief, which also sought a new trial based on newly discovered evidence. After conducting a lengthy eviden-tiary hearing, the trial court issued a very thorough and detailed written order that includes both factual findings and credibility determinations. Because the trial court’s order denying the defendant’s motion is amply supported by the record, we affirm.
In 1995, a jury found the defendant guilty of first degree murder and armed robbery, and the defendant was sentenced to life in prison. The evidence introduced at trial demonstrated that when the defendant, who was driving to a strip club with two other individuals, Jose Saldana (“Sal-dana”) and Oliver Menzies (“Menzies”), saw an unknown man alone on the side of the road (“the victim”), he turned the car around, pulled out a firearm, approached the victim, and told the victim to hand over his wallet. When the victim began moving towards the defendant, the defendant shot him at close range. The victim, who was an unarmed minister returning home for the night, died clutching a bible to his chest.
At trial, the State relied on eyewitness testimony as well as a photograph that was found in the defendant’s home linking the defendant to the murder weapon to prove the defendant’s guilt. One of the men the defendant was with on the night of the murder, Menzies, testified at the defendant’s trial and provided an eyewitness account of the murder. The other man in the car with the defendant, Saldana, gave deposition testimony fully corroborating Menzies’ version of- events. Additionally, several other witnesses testified that, shortly after the murder, the defendant personally told them he was the one who had shot the victim. For example, Jacqueline Spivey (“Spivey”) testified that she had seen the defendant with the murder weapon shortly before the shooting; the defendant later admitted to her that he had shot the victim; and the defendant told her he was worried that Saldana or Menzies would “snitch” on him. Menzies and Saldana were convicted as accessories after the fact to the murder, among other unrelated criminal charges.
Shortly after the defendant’s convictions were affirmed on appeal, he filed a motion for postconviction relief based on newly discovered evidence and claiming ineffective assistance of trial counsel (“the first 3.850 motion”). The defendant’s first 3.850 motion was based on an affidavit signed by Saldana in which he recanted his prior deposition testimony and averred that he and Menzies had framed the defendant for the victim’s murder in order to take the blame off themselves. Saldana’s affidavit stated that the defendant had *872 nothing to do with the murder and that Menzies was the actual triggerman. The affidavit also portrayed Menzies as the mastermind of a conspiracy to frame the defendant and stated that Menzies had threatened Saldana and other witnesses in order to procure the false testimony. During the pendency of the first 3.850 motion and prior to the evidentiary hearing that was conducted by the trial court, Menzies died in an automobile accident.[1]
Although Menzies was no longer available to refute Saldana’s claims, the State discovered evidence that effectively exposed the defendant’s plot to deceive the court. Prior to the evidentiary hearing, correctional officers discovered a letter from the defendant in Saldana’s prison cell telling Saldana what to say in his affidavit and impliedly threatening Saldana and his family if he did not cooperate. The letter in essence told Saldana to blame nearly everything on Menzies. After considering all of the evidence, including the damning letter written by the defendant, the trial court found that Saldana’s affidavit and testimony were completely unbelievable and denied the defendant’s first 3.850 motion. This Court affirmed that ruling in a short written opinion. McLin v. State, 949 So.2d 1123 (Fla. 3d DCA 2007) (per cu-riam).
Undaunted by the exposure of his first attempt to obtain a new trial by manipulating the evidence against him, on December 29, 2008, twelve years after filing his first 3.850 motion, the defendant filed another motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (“the second 3.850 motion”), again claiming he was entitled to a new trial based on newly discovered evidence. Attached to this motion were two affidavits, one from Jacqueline Spivey and one from Sabrina Francis.
In her affidavit, Spivey claimed that she had provided false testimony at the defendant’s trial at Menzies’ behest; Menzies was the actual shooter; Menzies had orchestrated a massive conspiracy to frame the defendant for the victim’s murder; and Menzies had threatened all of the witnesses and convinced them to collaborate so that each story corroborated the other. Spivey claimed that she falsely accused the defendant because they were former lovers and the defendant had left her for another woman.
The second affidavit was from Sabrina Francis, an inmate who was incarcerated in the same prison facility as Spivey. Francis did not testify at the defendant’s trial. Francis attempted to bolster Spi-vey’s affidavit by claiming that Sjoivey had confided in Francis and told her that she had falsely accused the defendant of murder before Spivey discovered that Francis knew the defendant. Francis, however, was the defendant’s sister’s best friend since childhood, and contrary to Francis’s sworn affidavit, Francis had known Spivey and the defendant for many years prior to Francis and Spivey meeting again in prison.
The trial court conducted an evidentiary hearing on the defendant’s second 3.850 motion, at which the following witnesses testified: Spivey, Francis, the defendant, Spivey’s attorney, Robyn Blake, one of the detectives who initially investigated the defendant, and a correctional officer. The trial court ultimately found that Spivey and Francis were unbelievable and that their testimonies were “an elaborate ruse *873 intended to deliberately mislead the trial court into granting post-conviction relief from [the defendant’s] homicide conviction.” The trial court accordingly denied the defendant’s second 3.850 motion and issued a very thorough and detailed written order, which included factual findings and credibility determinations.
The defendant’s sole contention on appeal is that the newly discovered evidence, when considered in conjunction with Salda-na’s affidavit and testimony from the first 3.850 motion, is so strong that the trial court erred as a matter of law by denying the second 3.850 motion. A review of the record, however, demonstrates the opposite.
To obtain a new trial based on newly discovered evidence, a defendant must satisfy a two prong test: First, the evidence must not have been known at the time of trial by the trial court, the parties, or counsel, and it must appear that the defendant or defense counsel could not have discovered the evidence through the use of due diligence; and second, the newly discovered evidence must be of such a nature that it would probably produce an acquittal if presented at a new trial. Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). “In determining whether the evidence compels a new trial, the trial court must ‘consider all newly discovered evidence which would be admissible,’ and must ‘evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.’ ” Schofield v. State, 32 So.3d 90, 92 (Fla. 2d DCA 2009) (quoting Jones v. State, 591 So.2d 911, 916 (Fla.1991)).
However, in reviewing the trial court’s application of these standards, “When the trial court rules on a newly discovered evidence claim after an eviden-tiary hearing, we review the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence.” Riechmann v. State, 966 So.2d 298, 316 (Fla.2007) (citing Melendez v. State, 718 So.2d 746, 747-48 (Fla.1998)). “‘Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury.’” Armstrong v. State, 642 So.2d 730, 735 (Fla.1994) (quoting Bell v. State, 90 So.2d 704, 705 (Fla.1956)); see also McLin, 827 So.2d at 955 (citing that same standard in the defendant’s first 3.850 motion).
Turning to the facts of this case, we first note that Saldana’s testimony, which the defendant asks this Court to rely on in determining that the trial court erred as a matter of law by denying his second 3.850 motion, was discredited at the evidentiary hearing conducted years ago, and the credibility finding by the trial court in the defendant’s first 3.850 motion was affirmed by this Court. Second, the trial court’s order denying the defendant’s second 3.850 motion makes specific factual findings that each of the defendant’s testifying witnesses was not believable and provided detailed explanations why the trial court found each witness not credible. For example, the trial court noted that Francis stated in her affidavit that she had formally met Spivey when they were housed in the same unit in federal prison; however, during cross-examination at the evidentia-ry hearing, Francis admitted that she had met Spivey several times before her incarceration and even once while Spivey was dating the defendant. Additionally, Francis swore in her affidavit that she had no familiarity with the defendant or the charges against him. However, the evidence established that Francis was best friends with the defendant’s sister, had *874 known the defendant for over twenty years, considered him “like a brother,” and knew that he had been convicted of murder. Despite her attempt to distance herself from the defendant and Spivey, the State established that when Francis executed her affidavit, she was actually living with the defendant’s sister and had resided there since her release from prison.
Similarly, Spivey sought to recant all of the testimony she had previously given under oath at the defendant’s trial by saying it was false, her testimony had been procured by threats from Menzies, and she had only cooperated to get revenge on the defendant because he left her for another woman. In addition to the inherent unreliability of a recanting witness who claims his or her prior testimony was perjury, Spivey’s new account was riddled with apparent inaccuracies. Spivey claimed that she had never seen the defendant with a .45 caliber pistol (the murder weapon), and that he only carried a .38 caliber pistol; however, the defendant himself admitted that he often carried a .45 caliber pistol. Spivey attempted to portray the defendant as a gentle man who would never use the pistol he carried for violence; however, she admitted on cross-examination that the defendant had been convicted for firing his pistol at Spivey herself prior to the homicide. The trial court also made detailed findings regarding Spivey’s demeanor while she was testifying. The trial court noted that Spivey “mumbled, avoided eye contact with either the Court or the prosecutor, touched her face, covered her mouth, and laughed inappropriately[ ] throughout her testimony.... [A]nd she bit her lips and rolled her tongue throughout her testimony.” The trial court also noted that although Spivey spoke quickly and naturally when providing her background information, she spoke more slowly and deliberately, as if trying to figure out what to say, when giving her new version of the events.
Lastly, Francis’s and Spivey’s credibility were further compromised by other evidence introduced at the evidentiary hearing. Francis and Spivey claimed, as Sal-dana had twelve years earlier, that the now-deceased Menzies had orchestrated a grand conspiracy to frame the defendant by coordinating the testimony of all of the witnesses so as to corroborate Menzies’ testimony. The State, however, introduced evidence at the hearing that established that nearly all of the witnesses who had testified at the defendant’s trial were serving sentences in different correctional facilities for various crimes when the alleged conspiracy was hatched. A correctional officer from one of these prisons testified that it would be nearly — if not completely — impossible from a logistical standpoint for Menzies to reach out to every person who testified against the defendant to ensure that they all provided the same story when they were all housed in different correctional facilities.
A trial court should grant a new trial only if it is convinced that the recanting witness’s testimony is actually true. Armstrong, 642 So.2d at 735. The trial court found that, “The dictates of common sense preclude the Court from entertaining the testimony of Francis and Spivey as ‘true.’ ” Because all of the trial court’s findings are supported by competent substantial evidence, we affirm. We also note that this is the defendant’s second attempt to obtain a new trial under .the guise of “newly discovered evidence” by offering perjurious testimony. We caution the defendant that abusing the legal system has consequences both for himself and for those witnesses who lie under oath.
Affirmed.

. Menzies' official cause of death was reported as an automobile accident, but both trial courts that examined the issue voiced skepticism that Menzies' untimely death was merely an accident. However, neither court found foul play, and we express no opinion on that issue.