[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11711

_____

D.C. Docket No. 5:12-cv-00159-RH

DARRYL BRIAN BARWICK,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 21, 2015)

Before WILSON, MARTIN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Death-row inmate Darryl Brian Barwick appeals the denial of his petition for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District

Court for the Northern District of Florida.  For the following reasons, the district court's order denying Barwick's petition for a writ of habeas corpus is affirmed.

## I.

On the morning of March 31, 1986, Rebecca Wendt was sunbathing at her Panama City apartment-complex pool until she returned to her apartment.  Around that time, another apartment-complex resident, Suzanna Capers, who also was sunbathing by the pool, observed a man walking around the complex.  Capers saw the man she subsequently identified as Darryl Barwick walk towards Wendt's apartment and later from the apartment and into the woods.

That evening, Rebecca Wendt's sister, who was also her roommate, returned home to find Rebecca's body wrapped in a comforter.  Investigators called to the scene found bloody footprints and fingerprints throughout the apartment.  Rebecca's bathing suit had been displaced, and an autopsy revealed thirty-seven stab wounds to her upper body and several defensive wounds on her hands.  The medical examiner reported that death would have occurred within three to ten minutes of the first stab wound.  No evidence of sexual contact with the victim was found, but criminal laboratory tests revealed a semen stain on the comforter wrapped around the victim.  Further testing indicated that the stain could have been left by two percent of the population and that Barwick fell within that two percent.

[2]

When initially questioned, Barwick denied involvement in the murder. But after he was arrested on April 15, 1986, Barwick made a full confession. Barwick told investigators that after he had observed Rebecca sunbathing, he went home, parked his car, got a knife, walked back to Rebecca's apartment complex, walked past her three times, and then followed her into her apartment. Barwick claimed that when he entered Wendt's apartment, he had only intended to steal something, but when Rebecca resisted, he lost control and stabbed her, and continued to stab her repeatedly as they struggled and fell to the floor.

Barwick was then indicted on four counts: (1) first-degree murder; (2) armed burglary; (3) attempted sexual battery; and (4) armed robbery. He was tried by a jury and convicted on all counts. By a 9-3 vote, the jury recommended that Barwick be put to death, and the judge subsequently sentenced Barwick to death.[1] On appeal, however, the Florida Supreme Court reversed Barwick's convictions and sentences and remanded for a new trial.[2]

---

[1] The trial court sentenced Barwick to two life terms and one thirty-year term on the noncapital offenses.

[2] *Barwick v. State*, 547 So. 2d 612, 612 (Fla. 1989) (per curiam) ("*Barwick I*") (holding that Barwick, who is white, still had standing to object to peremptory challenges directed to prospective black jurors on the ground that they were excluded solely because of their race).

[3]

On the third day of his second trial, a mistrial was declared,[3] and a new trial commenced on July 6, 1992.  Barwick was again convicted on all counts.  This time the jury unanimously recommended Barwick be put to death, and the judge so sentenced him.  The trial judge found six aggravators proven beyond a reasonable doubt: (1) previous convictions of violent felonies of sexual battery with force likely to cause death or great bodily harm and burglary of a dwelling with an assault; (2) the murder was committed during an attempted sexual battery; (3) the murder was committed to avoid arrest; (4) the murder was committed for pecuniary gain; (5) the murder was especially heinous, atrocious, or cruel; and (6) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral justification.[4]  The trial court found no statutory mitigation, and despite recognizing that Barwick suffered abuse as a child and had some mental deficiencies, it wrote in its sentencing order that there were no non-statutory mitigating factors, either.  The Florida Supreme Court affirmed Barwick's convictions and death sentence.  *Barwick v. State*, 660 So. 2d 685, 697 (Fla. 1995) (per curiam) ("*Barwick II*").  The United States Supreme Court denied

---

[3] The trial judge promptly declared a mistrial after a prosecution witness testified that Barwick had failed a polygraph.

[4] The Florida Supreme Court struck the last aggravator on direct appeal, concluding that the evidence suggested that Barwick had planned to rape, rob, and burglarize, but not murder the victim.  Nevertheless, it found that five aggravating factors remained against minimal mitigating evidence, so the death sentence was not unreasonable.  *Barwick v. State*, 660 So. 2d 685, 696-97 (Fla. 1995) (per curiam).

[4]

certiorari on January 22, 1996. *Barwick v. Florida*, 516 U.S. 1097 (1996) ("*Barwick III*").

On March 17, 1997, Barwick filed an initial motion for post-conviction relief in the state circuit court, and he amended the motion on August 26, 2002, raising twenty-one claims in total. On December 4, 2003, the state circuit court granted an evidentiary hearing on four of the claims, reserved ruling on one, and summarily denied the remainder. In a second amended motion for postconviction relief, Barwick realleged the same twenty-one claims and added two new claims. The state circuit court issued an order denying Barwick's motion on August 28, 2007. Barwick filed an appeal with the Florida Supreme Court. While that appeal was pending, he also filed a petition for a writ of habeas corpus with the Florida Supreme Court. On June 30, 2011, the Florida Supreme Court affirmed Barwick's conviction and death sentence and also denied his motion for a writ of habeas corpus. *Barwick v. State*, 88 So. 3d 85 (Fla. 2011) (per curiam) ("*Barwick IV*").

On May 25, 2012, Barwick filed this federal habeas petition, raising seven issues. The district court denied all of his claims but granted a certificate of appealability ("COA") as to one issue, and a member of this Court expanded the COA to include four other claims, for a total of five claims: (1) whether Barwick's trial counsel rendered ineffective assistance related to mitigation evidence during the penalty phase; (2) whether the district court erred in denying Barwick's federal

[5]

constitutional ineffective-assistance-of-trial-counsel ("IATC") claim with respect to the alleged failure of counsel to effectively challenge the guilt-phase testimony of state witness Suzanna Capers, which the jury was instructed to consider at the penalty phase; (3) whether the district court erred in denying Barwick's federal constitutional claim with respect to alleged violations of *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972), by allegedly permitting Capers to testify falsely and by emphasizing Capers's allegedly incorrect statements to the jury; (4) whether the district court erred in denying Barwick's federal constitutional challenge to the trial court's rejection of Barwick's childhood abuse as a mitigating circumstance; and (5) whether the district court erred in denying Barwick's federal constitutional challenge to his execution as a "brain damaged, mentally impaired individual."

## II.

When reviewing the denial of a habeas petition, the Court reviews *de novo* questions of law and mixed questions of law and fact. *LeCroy v. Sec'y, Fla. Dep't Corr.*, 421 F. 3d 1237, 1259 (11th Cir. 2005). It reviews findings of fact for clear error. *Id.* Relief is warranted when the state court's resolution of a claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the ruling "was based on an unreasonable determination of the facts in light of the evidence

[6]

presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). We presume a state court's factual determinations to be correct, and the applicant bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III.

### A. Ineffective Assistance

A person challenging a conviction based on ineffectiveness of counsel must show both that his counsel provided deficient assistance and that prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Deficient assistance means "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. at 2064. But a "wide range" of performance meets the standard of "reasonableness," and we apply a "strong presumption" that counsel's representation fell within that range. *Id.* at 689, 104 S. Ct. at 2065. Only when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" is counsel's assistance deemed to be constitutionally "deficient." *Id.* at 687, 104 S. Ct. at 2064.

Prejudice occurs when the challenger has shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

[7]

undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. So even errors that have "some conceivable effect on the outcome of the proceeding" are not enough to show prejudice. *Id.* at 693, 104 S. Ct. at 2067. Prejudice results only when counsel's errors were "so serious" that they deprived the defendant of a "fair trial, a trial whose result is reliable." *Id.* at 687, 104 S. Ct. at 2064.

When an IATC claim is based upon a failure to present mitigating evidence, we must consider "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." *Henyard v. McDonough*, 459 F. 3d 1217, 1242 (11th Cir. 2006) (per curiam). When mental health is at issue, counsel does not offer ineffective assistance when it later becomes apparent that an expert who would have testified more favorably than the expert who was actually called may have existed. *See Ward v. Hall*, 592 F.3d 1144, 1173 (11th Cir. 2010) ("As we have held many times before, 'the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.'" (quoting *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997))). When evaluating the claim, the court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S.

[8]

30, 41, 130 S. Ct. 447, 453-54 (2009) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515 (2000)).

In short, under *Strickland*, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 788 (2011). Moreover, the Supreme Court has emphasized that the "*Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.* (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066).

And in a federal habeas proceeding, we must also apply deference to a state court's rejection of a *Strickland* claim. *See id*. Title 28, United States Code, Section 2254(d), amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 104, 110 Stat. 1214 (1996), sets forth the statutory authority of federal courts to issue habeas corpus relief for persons in state custody:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

[9]

Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In applying this standard, the Supreme Court has explained that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102, 131 S. Ct. at 786. That is, when evaluating a petitioner's IATC habeas claim,

> [t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.

*Id.* at 101, 131 S. Ct. at 785.

In short, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410, 120 S. Ct. at 1522. A state court's determination that a claim lacks merit is reasonable so long as "fairminded jurists could disagree" about whether the state court's determination was correct. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004). And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* Because "[t]he

[10]

*Strickland* standard is a general one . . . the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105, 131 S. Ct. at 788. In sum, "a habeas court must determine what arguments . . . supported . . . the state court's decision . . . [and] whether it is possible fairminded jurists could disagree [about whether] those arguments . . . are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102, 131 S. Ct. at 786.

### 1. The Mitigation Claim

Barwick contends that he was denied effective representation at the penalty phase because counsel allegedly failed to adequately present mitigating evidence. Counsel presented seven mental-health experts and seven lay witnesses to detail Barwick's tragic home life, including years of sexual, physical, and mental abuse, as well as to detail Barwick's mental deficiencies, learning disabilities, and psychological problems. Nevertheless, Barwick argues that trial counsel's performance was deficient principally for two reasons: (1) counsel's "kitchen sink approach"—in which counsel presented several experts he knew would not be helpful to Barwick's case in an effort to make the defense appear more trustworthy and forthright to the jury—undermined the proper functioning of the adversarial process by presenting harmful testimony that reduced the collective reliability of the testimony; and (2) counsel relied solely on the investigation conducted by the attorney who represented Barwick in his first trial and failed to uncover additional

[11]

mitigating evidence that another expert proffered during the post-conviction proceeding.  The Florida Supreme Court rejected both of these arguments because Barwick failed to show either deficient performance or prejudice under *Strickland*. We affirm the district court's denial of Barwick's penalty-phase IATC claim based on his failure to show prejudice without deciding if trial counsel's conduct was deficient.  *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").  On this record, we cannot say that the Florida Supreme Court engaged in an unreasonable application of federal law.

**a.**

To explain the basis for our decision, we first review the evidence with respect to both of Barwick's arguments.  We begin by summarizing the testimony of the three experts in particular who Barwick asserts counsel should not have presented: Drs. Annis, McClaren, and Warriner.

Dr. Lawrence Annis, a clinical psychologist, testified that he examined Barwick twice in 1986, pursuant to court order.  Dr. Annis described various psychological tests that he administered to Barwick, which revealed that Barwick exhibited overall normal intelligence but showed better motor skills than verbal skills.  Dr. Annis further testified that although Barwick did not seem to be bipolar

[12]

or schizophrenic, he did appear to be "seeing the world differently from the way normal people would see it," and he was more sad and anxious than the typical inmate Dr. Annis examined.    Additionally, Dr. Annis testified that Barwick exhibited a lot of resentment and anger, which might have resulted from physical abuse he endured as a child at the hands of his father, and that Barwick "showed many of the signs" of a "mentally disordered sex offender."[5]    Despite these findings, Dr. Annis testified that, in his opinion, Barwick was not insane, nor did he suffer from any mental disease or defect but that he did meet the criteria for an antisocial personality diagnosis, although Dr. Annis did not officially diagnose Barwick with this condition.

Dr. Harry McClaren, a psychologist specializing in forensic psychology, also testified that he examined Barwick pursuant to a court order in 1986.  Dr. McClaren administered several psychological tests on Barwick, one of which revealed that Barwick's overall intelligence was in the normal range but that his verbal intelligence was below average.  Dr. McClaren testified that Barwick exhibited "a degree of brain dysfunction" and that Barwick "had difficulties in the sexual area . . . [which] were related to what happened in this homicide."

---

[5] Dr. Annis testified that "mentally disordered sex offender" is not a medical or psychological term but a legal term that was adopted by the Florida Legislature (and other states), to determine whether to enroll criminal defendants in sex-offender treatment programs. It appears that although Barwick might have qualified for treatment, the fact that he did not seem interested in therapy impacted Dr. Annis's decision not to recommend him for the program.

[13]

Furthermore, as part of his examination and assessment, Dr. McClaren testified that he spoke with several members of Barwick's family, including his mother, a sister, and a brother,  as well as Barwick's girlfriend, and other people who had interacted with Barwick; in short, Dr. McClaren testified that he did "everything [he] could to understand [Barwick.]"  These discussions and his review of other written materials revealed that Barwick's father had abused Barwick as a child, and Dr. McClaren told the jury that this abuse "certainly" could have contributed to Barwick's sexual difficulties.  Dr. McClaren stated that he did not believe that Barwick was insane because that conclusion could be drawn only if any mental disease or defect that Barwick had been suffering from was so severe that it rendered him incapable of appreciating right from wrong or conforming his conduct to the law, which Dr. McClaren did not believe to be the case.  Nor did Dr. McClaren believe that Barwick was operating under the influence of extreme mental or emotional disturbance at the time of the offense.  Finally, Dr. McClaren testified that Barwick exhibited the criteria of a mentally disordered sex offender and that he had diagnosed Barwick with an antisocial personality disorder.

Dr. Clell Warriner, a clinical psychologist, testified that he first evaluated Barwick in 1980, when Barwick was just thirteen years old, at the request of an attorney defending Barwick on juvenile charges.  By that time, Dr. Warriner told the jury, Barwick had already exposed himself to a girl, had hit another girl after

[14]

she had called him a name, and had touched a third woman inappropriately.  These prior instances of sexual misconduct may have been inadmissible if offered by the government.[6]  Dr. Warriner further testified that he examined Barwick for a second time three years later, in 1983, this time at the request of an attorney representing Barwick on sexual-battery charges.  Although when Dr. Warriner first evaluated Barwick he thought that Barwick could be rehabilitated, Dr. Warriner testified that after having evaluated Barwick a second time, he concluded that Barwick was a psychopathic sexual deviant who was extraordinarily dangerous and incapable of being rehabilitated.  Dr. Warriner reached this same conclusion when he examined Barwick for a third time, this time in connection with the crime at issue in this habeas petition.  Finally, Dr. Warriner speculated that there were likely other episodes of escalating sexual violence for which Barwick was not caught.

---

[6] Notably, however, the expert that Barwick would have preferred to have been presented, Dr. Eisenstein, *see infra* at 16-19, testified at the post-conviction proceeding that Barwick did not suffer from an antisocial personalty disorder at least in part because Barwick did not exhibit a pattern of antisocial behavior, and such a pattern is usually necessary to make such a diagnosis.  On cross-examination, however, the government questioned Dr. Eisenstein about the prior episodes to which Dr. Warriner testified to refute Dr. Eisenstein's testimony that Barwick had not exhibited a pattern of behavior sufficient to justify an antisocial-personality-disorder diagnosis.  So, while these incidents of prior sexual misconduct might have been inadmissible if elicited by the state on direct examination, it is possible that the jury still would have become aware of them during the proceedings.

[15]

Relevant to Barwick's second argument—that counsel merely relied on the investigation conducted by Barwick's counsel during his first trial[7] and should have been able to find an expert to testify more favorably than the experts that he did present—is the testimony of Dr. Hyman Eisenstein, proffered at his post-conviction hearing. Because it is important to understanding our determination today, we summarize Dr. Eisenstein's testimony in some detail.

Dr. Eisenstein first stated that he had testified in dozens of criminal cases in both state and federal court in Florida but noted that he had always testified for the defense.[8] He explained that he evaluated Barwick in 2000 and again in 2002—fourteen and sixteen years after the commission of the crime, during which time Barwick had been incarcerated—and administered numerous psychological tests to Barwick. Based on his examination, Dr. Eisenstein found that Barwick exhibited slightly below-normal intelligence and stronger non-verbal than verbal intelligence. He opined that the difference in these intelligence measures probably informed Dr. McClaren's conclusion that Barwick exhibited some brain

---

[7] Counsel, however, did not solely rely on Barwick's counsel's investigation during his first trial. Counsel appointed Dr. Walker, a psychiatrist, who had not previously evaluated Barwick, to evaluate Barwick in advance of his third trial and presented this expert to testify during the penalty phase.

[8] In contrast, Dr. Annis, for instance, stated that he had testified numerous times for both the state and for the defense in these types of proceedings because a "psychologist that got a reputation of being primarily [sic] defense or prosecution witness would soon find that judges weren't going to be sending them court orders to do evaluations."

[16]

dysfunction.  In addition, Dr. Eisenstein expressed his belief that Barwick suffered from physical brain damage, particularly in the left temporal region.  Overall, Dr. Eisenstein testified that the results of these tests were consistent with the findings of the experts who had previously testified, including Drs. Annis and McClaren.

Besides testing, Dr. Eisenstein spoke with members of Barwick's family, including two brothers, two sisters, and his mother.  Dr. Eisenstein described the physical abuse that Barwick and his siblings suffered at the hands of their father, the sexually charged and abnormal nature of the Barwick household, and the emotional abuse that the Barwick children endured as a result of name-calling by Barwick's father.  Because of Barwick's mental deficiencies, Dr. Eisenstein opined that Barwick was subjected to additional emotional abuse and was more vulnerable to the abuse that he received than his brothers.

Based on Dr. Eisenstein's examination and review of available information, he diagnosed Barwick with intermittent explosive disorder.  According to Dr. Eisenstein, this diagnosis made applicable to Barwick the statutory mitigator that the defendant could not substantially conform his conduct to the requirements of the law.  Dr. Eisenstein also testified that he believed Barwick qualified for the extreme-emotional-distress statutory mitigator because "somebody with normal emotional and mental functioning would not commit such acts," and "only . . . the extreme form of the emotional or mental impairment . . . could explain . . . what

[17]

happened." Also, although Barwick was actually nineteen years old at the time that he committed the crime in this case, Dr. Eisenstein testified that he believed that Barwick was actually "functioning at an early-adolescence stage," somewhere between the ages of 11 and 14, at the time.

On cross-examination, Dr. Eisenstein admitted that he had not asked Barwick several questions regarding what Barwick remembered about the events leading up to the murder, despite earlier testimony that he had tried to collect as much information as possible to understand why Barwick committed the murder. Dr. Eisenstein also conceded that he had not reviewed Barwick's trial testimony and the confession that Barwick had given police regarding why he committed the attack. Moreover, although the trial transcript revealed that Barwick had told his brothers that he killed Rebecca because she had seen his face and he did not want to go back to prison, Dr. Eisenstein did not ask Barwick's brothers about this conversation. During cross-examination, Dr. Eisenstein also acknowledged that he had not reviewed a report prepared by a neurologist who had administered an electroencephalogram (EEG) on Barwick in 1986, which showed that although there was "some slowing" in Barwick's brain, it was a "normal neurologic evaluation." Finally, although Dr. Eisenstein believed that Barwick exhibited four of the seven criteria that inform whether an individual suffers from an antisocial

[18]

personality disorder, and the presence of only three criteria is necessary to make such a diagnosis, Dr. Eisenstein declined to diagnose Barwick with the disorder.

## b.

Turning to the arguments that Barwick advances in this habeas petition, we make a few observations.  First, we note that both Drs. Annis and McClaren had testified for the government at both the guilt and penalty phases in Barwick's first trial, and the record indicates that the state would have called at least Dr. McClaren if Barwick's counsel had not.  Accordingly, the testimony that Barwick was not insane because he did not suffer from a mental disease or defect sufficient to make this diagnosis, that he knew right from wrong, and that he was not under the influence of extreme mental or emotional disturbance, to which Barwick takes most offense, most likely still would have been presented, and therefore would not have been avoided even if Barwick's counsel had not called these witnesses.[9]

We also note that Drs. Annis, McClaren and Warriner testified similarly in many respects to the other experts that counsel called, as well as to Dr. Eisenstein, Barwick's preferred expert.  For instance, Drs. Annis's and McClaren's findings regarding Barwick's intelligence were consistent with those of Dr. Eisenstein. Similarly, Drs. Annis, McClaren and Eisenstein, as well as several other experts,

_____

[9] Dr. Warriner, on the other hand, did not testify during Barwick's first trial, and he was not on the government's witness list at Barwick's third trial, but counsel still decided to call him, as part of counsel's strategy to try to earn the defense points with the jury for being forthright.

[19]

discussed the abuse that Barwick suffered, which was extensively detailed by the lay witnesses whom Barwick's counsel presented, and each of these experts testified that the abuse could have contributed to Barwick's actions. Barwick took special offense to Dr. Warriner's testimony that Barwick was a psychopathic sexual deviant and that he could not be rehabilitated, but similar testimony was also proffered by two other experts:  Dr. Walker and James Beller, a clinical psychologist—neither of whose testimony he challenges.

Furthermore, although Barwick contends that this portion of Dr. Warriner's testimony was harmful and led the jury to conclude that the death penalty was the most appropriate sentence, the same testimony arguably could have supported a finding that Barwick was unable to conform his conduct to the law, that he suffered from a mental disease or defect, or that he was under the influence of extreme mental or emotional disturbance.[10]  Likewise, despite Barwick's characterization of

---

[10] Although we do not ultimately rule under *Strickland*'s performance prong on counsel's decision to present Dr. Warriner's testimony, we do express some concern regarding counsel's strategy.  Counsel's decision to put Dr. Warriner on the stand may have allowed for the admission of otherwise-inadmissible evidence, and it appeared to place another unfavorable opinion of Barwick before the jury. *Cf. Powell v. Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 64 (1932) (noting that due process requires a criminal defendant to be provided with counsel in part so that he will not be convicted "upon  incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible"); *Smith v. Murray*, 477 U.S. 527, 554-55, 106 S. Ct. 2661, 2677 (1986) (Stevens, J., dissenting) (stating that the introduction of highly prejudicial, inadmissible evidence at a capital sentencing proceeding undermines the validity of the proceeding and violates the Eighth Amendment); *but cf. id.* at 538, 106 S. Ct. at 2668 (Majority opinion) (concluding that inadmissible evidence does not result in a miscarriage of justice sufficient to overcome the procedural default of such a claim when the error did not preclude "the

Dr. Eisenstein's testimony, Dr. Eisenstein's explicit finding that Barwick could not conform his actions to the law could have also have led the jury to believe that Barwick would not have been able to conform his actions to the law if he were sentenced to prison and eventually released and that a death-penalty sentence was appropriate. It is difficult to predict the manner in which a judge and jury will construe mental-health issues and their impact on a defendant's behavior; sometimes such evidence will be viewed as mitigating, and other times it may be construed as damaging. *Cf.*, *Suggs v. McNeil*, 609 F.3d 1218, 1231 (11th Cir. 2010) (pointing out that the use of many different types of evidence at the penalty phase of a capital case is a double-edged sword). Although it is clear from the unanimous jury recommendation that Barwick's counsel's mitigation strategy failed, we remain mindful of the Supreme Court's warning that hindsight should not affect our interpretation of counsel's performance. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

---

development of true facts nor resulted in the admission of false ones"). We nevertheless recognize that the permissible range of counsel performance is wide because it is "all too tempting . . . to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Although unsuccessful, it seems as though counsel might have elicited Dr. Warriner's testimony in an attempt to establish that, "[t]he Capital Felony was committed while the Defendant was under the influence of extreme mental or emotional disturbance," a statutory mitigating circumstance. *See State v. Barwick*, No. 86-940 (Fla. 14th Cir. Ct. Aug. 4, 1992) (Sentencing Order) ("Although there was testimony that the defendant was a psychopathic sexual deviant . . . . the expert testimony when considered as a whole does not establish this as a significant mitigating circumstance.").

[21]

Finally, a review of the mitigation testimony offered by the experts called by defense counsel reveals that it was not as inconsistent as Barwick suggests. All of the testimony elicited tells the same basic story: Barwick suffered substantial abuse as a child, this abuse affected his mental state, and Barwick's impaired and abnormal mental state contributed to the crime that he eventually committed. Usually, habeas relief will not be provided under these circumstances. *See Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1266 (11th Cir. 2012).

But even if we were to find a *Strickland* violation based upon the record before us, at this point in the proceedings, that is not enough for Barwick to prevail. Now our role is limited to considering whether the Florida Supreme Court's conclusion that there was not a *Strickland* violation was reasonable. *See Harrington*, 562 U.S. at 101, 131 S. Ct. at 785. Stated another way, our job is to determine whether "fairminded jurists could disagree" as to whether the Florida Supreme Court's conclusion was correct, and we are prohibited from upsetting the Florida Supreme Court's ruling so long as that ruling is debatable. *See Yarborough*, 541 U.S. at 664, 124 S. Ct. at 2149. In this case, it is, so, as the district court concluded, Barwick's habeas petition must be denied.

In its decision denying Barwick's ineffective-assistance-of-trial-counsel claim, the Florida Supreme Court first summarized the testimony proffered by all seven mental-health experts and all seven lay witnesses called by Barwick's

[22]

counsel at the penalty phase. *See Barwick IV*, 88 So. 3d at 96-99. The Florida Supreme Court also evaluated and compared that evidence to the testimony of Dr. Eisenstein. *Id.* at 100. It highlighted two main differences between Dr. Eisenstein's testimony and that of the experts presented at trial: (1) Dr. Eisenstein, unlike the trial experts, found the presence of two statutory mitigators (*i.e.*, that Barwick acted under influence of extreme mental or emotional disturbance, and that his capacity to conform his conduct to the requirements of the law was substantially impaired); and (2) Dr. Eisenstein disagreed with the defense experts who in fact diagnosed Barwick with an antisocial personality disorder. *Barwick IV*, 88 So. 3d at 100.[11]

In rejecting Barwick's penalty-phase IATC claim, the Florida Supreme Court stated that it "has consistently rejected the proposition that trial counsel's performance is deficient simply because a defendant finds an expert, in postconviction proceedings, that will testify more favorably for him." *Id.* It also explained that Barwick was not prejudiced by counsel's conduct. *Id.* ("The fact that some testimony proved to be unfavorable to Barwick does not undermine our confidence in the verdict."); *see id.* at 94 (when setting forth the standard to establish a *Strickland* violation, stating that "[a] court considering a claim of

---

[11] There were other differences between Dr. Eisenstein's testimony and that of the other experts, most notably that Barwick was functioning at an early-adolescence stage at the time of the murder.

ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied").

Evaluating this ruling under AEDPA's deferential standard, we must affirm the denial of Barwick's petition for habeas corpus relief.  For one thing, Barwick's arguments here concern mitigation, not aggravation; accordingly, the five aggravating factors found to support the death-penalty sentence would remain, even if counsel had not presented the testimony of Drs. Annis, McClaren and Warriner.   And even though Dr. Eisenstein testified to the presence of two statutory mitigating circumstances and another nonstatutory mitigating circumstance, the Supreme Court has explained that "[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence."   *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 877 (1982).  In weighing the aggravating evidence against the mitigating testimony of Dr. Eisenstein, the Florida Supreme Court identified perceived shortcomings related to Dr. Eisenstein's testimony, including Dr. Eisenstein's failure to review (1) Barwick's confession to the police, (2) Barwick's confession to his brothers and his father, and (3) the police and sentencing reports pertaining to Barwick's prior rape case. Based on these alleged deficiencies, the Florida Supreme Court reasoned that the government might have been able to create doubt as to the reliability of Dr.

[24]

Eisenstein's professional opinion, had he testified. *See Barwick IV*, 88 So. 3d at 100. In addition, the record shows that Dr. Eisenstein has previously testified for the defense only. For these reasons, we cannot conclude there is a reasonable probability that the jury would have afforded Dr. Eisenstein's testimony much, if any, weight—at least not sufficient to undermine our confidence in the outcome.

Based upon the events and facts of this case, the fact that the aggravating circumstances would have still greatly outweighed any mitigating circumstances, and a unanimous jury recommendation, we cannot say that the Florida Supreme Court was unreasonable when it determined that its confidence in the sentence imposed was not undermined by any alleged deficient performance by Barwick's counsel.

### 2. Failure-to-Impeach Claim

Next, Barwick contends that counsel rendered ineffective assistance at the guilt phase of his trial when he failed to impeach state witness Suzanna Capers. At trial, Capers had testified that when she observed Barwick, she felt suspicious, worried and uneasy:

> And I saw him a couple of times, two or three or four times and I started getting suspicious, I never saw him come back around until later, a little while later he was walking in front where I was straight ahead of him and he stood there and he just kind of started and I thought, here I am laying out and by myself and I started getting a little worried and he just stood there and stared at me and then

[25]

he started pointing, he pointed at me, he pointed like this, toward her apartment where he was standing and he did it a few times, this [g]esture (indicating) and then I started getting suspicious, really started feeling uneasy and then he turned around and walked back toward her apartment and I was relieved that he wasn't standing there staring at me anymore.

Shortly after the murder, though, Capers had provided the following deposition testimony:

> A. . . . [H]e did a gesture, I mean, not toward me but he did like this.  He pointed this way to his left, then he pointed to his right, just like that.
>
> Q.  He did?
>
> A.  Yeah.  It's like he didn't, like he couldn't make up his mind which way he wanted to go.  And he saw that I saw him and like got embarrassed that I saw him looking at me.  And so then he started going toward Russ Lake Drive.
>
> ***
>
> Mr. Harper:  Let me interrupt here just to ask a question.  When he was standing there pointing one way with one finger and the other way with the other finger, was he doing that more or less to himself, in your opinion, or was he looking at you and doing it while you were watching him –
>
> A.  It was kind of like, you know how you will stand there telling you to do something to yourself, that's like what he was doing.
>
> Mr. Harper:  So it looked like he was talking to himself?
>
> A.  Yeah, talking to himself, yeah.

[26]

Mr. Harper:  He wasn't making any gestures to you or for your benefit?

A.  No.  That's not what I saw.  He just looked like an innocent person to me, I mean he just didn't – looked like he was just looking at a girl laying out, you know what I mean?

And she testified at his first trial as follows:

. . . I was reading and I just so happened to look up and I saw him standing there staring at me and I just looked up and, like, he might have gotten embarrassed or I caught him looking at me and he pointed like this, (Indicating), and pointed this way in two different directions.
* * *
Q.  Was there any kind of menacing gesture toward you?

A.  No, sir – well, he just pointed like this, (Indicating).

Q.  You didn't know what that meant?

A.  No, sir.  I thought it was kind of odd.  You know, I thought he just stopped and looked, you know; I didn't think nothing of it at the time.

Based on these excerpts, Barwick argues that Capers's testimony at his third trial was inconsistent with her previous testimony and that his trial counsel should have attempted to impeach her testimony.  Moreover, he complains that the prosecution relied on Capers's more damaging statements during its closing argument in the guilt phase of his third trial.  The prosecutor stated,

[Barwick] sees the bathing suit clad young lady, 24 years old.  Obviously decent looking, nice looking.  On his way back, . . . he sees her. . . .  He then plans, I'm going back

[27]

> there.  He goes back, goes back to the very same spot. He then eyes two women who are sunbathing as if to select his victim.  [¶] Both of them in bathing suits, sunbathing. . . .  [H]e could have certainly picked the unoccupied dwellings to commit a burglary if he just wanted to steal something.  [¶] . . . Suzanne Capers or Rebecca Wendt. . . . [W]hat did Suzanne Capers tell you. He stared at me and I got this eerie feeling.  It was spooky, it was strange, it was creepy.  That's evidence you can take into consideration as to how he was staring, selecting.

Because the jury was instructed to consider evidence it heard during both the guilt and penalty phases when deciding on its advisory sentence, Barwick contends that the jury erroneously viewed as aggravating evidence a portrayal of him as a "stalking, lurking predator who evaluated possible victims before deliberately selecting one."[12]

As with his previous IATC claim, to succeed, Barwick needs to show not only that his counsel rendered ineffective assistance under *Strickland*, but also that the Florida Supreme Court's conclusion that counsel was not ineffective was contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court, or that its decision resulted from an

---

[12] Florida's capital sentencing statute limits the aggravating circumstances a sentencer may consider to those enumerated in the statute.  Fla. Stat. § 921.141(5).  As a matter of Florida law,"nonstatutory aggravating circumstances are not permitted in the sentencing evaluation process."  *Oyola v. State,* 158 So. 3d 504, 509 (Fla. 2015) (per curiam).

[28]

unreasonable determination of the facts in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d). Barwick cannot carry this heavy burden.

The Florida Supreme Court denied Barwick's IATC claim for failure to impeach Capers because it found that Barwick could not show prejudice. *See Barwick IV*, 88 So. 3d at 96. Specifically, the court said, "Barwick's claim as it relates to the penalty phase of trial also is without merit; the jury returned a unanimous verdict recommending a death sentence, and there exist five valid aggravating circumstances, with minimal mitigating evidence, supporting the sentence." *Id.*

Thus, the lack of prejudice related to any alleged deficient performance due to the failure of counsel to cross-examine Capers formed the basis for the Florida Supreme Court's ruling, and we are required to pay deference to this determination under 28 U.S.C. § 2254(d). Capers's testimony was at most tangentially related to one aggravating circumstance. To the extent Capers's testimony constituted nonstatutory aggravation, there is no reasonable probability that its omission would have changed the outcome of the penalty phase given the unanimous jury verdict for death, five valid and weighty aggravating circumstances, and minimal mitigating evidence supporting the sentence. It would have barely changed Barwick's sentencing profile. Under these circumstances, we cannot say that the Florida Supreme Court unreasonably applied *Strickland*'s prejudice prong when it

[29]

determined that counsel's failure to cross-examine Capers did not prejudice Barwick.

B. Giglio *Claim based on Suzanna Capers's Testimony*

The Supreme Court has made clear that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio*, 405 U.S. at 153, 92 S. Ct. at 766 (citation and quotation marks omitted). Thus, when the prosecution engages in these acts, it may form a basis for either overturning a conviction or sentence. The Florida Supreme Court accurately set forth the rules of law and standards of review that govern the consideration of a *Giglio* claim as follows:

> To demonstrate a *Giglio* violation, a defendant must prove that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. *Taylor v. State*, 62 So. 3d 1101 (Fla. 2011); *Guzman v. State*, 941 So. 2d 1045, 1050 (Fla. 2006). "Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict." *Davis v. State*, 26 So. 3d 519, 532 (Fla. 2009), *cert. denied*, [561] U.S. [1029], 130 S. Ct. 3509, 177 L. Ed. 2d 1097 (2010). A *Giglio* claim also presents a mixed question of law and fact, and a reviewing court will defer to the lower court's factual findings if they are supported by competent, substantial evidence, but will review the court's application of law to facts de novo. *Sochor v. State*, 883 So. 2d 766, 785 (Fla. 2004).

*Barwick IV*, 88 So. 3d at 103.

[30]

Barwick argues that the prosecutor violated *Giglio* because he knew that the testimony he elicited from Capers and emphasized at closing at Barwick's third trial was allegedly false in that it differed from the testimony she gave at Barwick's first trial and in a deposition she gave nearer in time to the murder. Barwick contends the testimony was material "because the jury did not hear the witness say she had seen an innocent man walking around the complex, mumbling to himself, but instead that she saw a suspicious man who was trying to indicate something to Capers or frighten her in some way." *Id.* at 105.

The Florida Supreme Court found that Barwick failed to prove that Capers's testimony was false. It stated, "Barwick does not demonstrate that the witness's testimony as to the facts she observed has changed, only that Ms. Capers's interpretation of those facts differed between her 1986 and 1992 testimony." *Id.* Under the deferential § 2254(d) standard, we cannot say that the Florida Supreme Court's finding that the statements were not false, nor could they be, because they did not concern objective facts that were either true or not true, but rather subjective opinions that may have evolved,[13] is "contrary to" or "an unreasonable

---

[13] We note that the Florida circuit court granted Barwick an evidentiary hearing in order to develop this claim. The state court then made a factual finding that Barwick had failed to carry his burden of establishing that Capers's testimony was false. This factual assessment is reasonably supported by the record. And as amended by AEDPA, § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and

application of Federal law," or an "unreasonable determination of the facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1)-(2).

### C. Claim Regarding the Rejection of Childhood Abuse as a Mitigating Factor

Barwick also claims that the sentencing judge improperly failed to consider nonstatutory mitigating evidence presented at the penalty phase related to the child abuse that he suffered. A capital sentencer must consider and give effect to mitigation evidence that is presented. *See Eddings*, 455 U.S. at 114-15, 102 S. Ct. at 876-77. As the Supreme Court has stated,

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer *refuse to consider*, as a matter of law, any relevant mitigating evidence. . . . The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight *by excluding such evidence from their consideration*.

convincing evidence." 28 U.S.C. 2254(e)(1). We cannot say that Barwick's allegations about the inconsistencies between Capers's statements prove by "clear and convincing evidence" that her testimony at his third trial was false.

Moreover, even if we disagreed and found that Capers's testimony was false, that is merely the first of the three *Giglio* prongs that Barwick must satisfy. At the evidentiary hearing, Barwick did not call Suzanna Capers to testify but instead relied upon the testimony of Assistant State Attorney Alton Paulk, who prosecuted Barwick. Paulk testified that while he recognized that there were some differences in the statements made by Capers, he did not perceive any of the statements as false but instead attributed the differences to Capers's impressions of the events changing over time. This testimony goes directly to the heart of the second *Giglio* prong: that the prosecutor *knowingly* have offered false testimony or failed to correct testimony subsequently *known* to be false. Again, this is a factual determination entitled to deference.

[32]

*Id.* at 114-15, 102 S. Ct. at 876-77 (emphasis added; original emphasis omitted).

To support his claim, Barwick relies on a portion of the sentencing order that states, "The court does not find in this case that the abuse received by the defendant as a child is a mitigating circumstance." The Florida Supreme Court found on direct appeal, however, when the sentencing order is read in context, it is clear that the judge did in fact consider the abuse that Barwick endured as a child, satisfying *Eddings*'s requirement. *See Barwick II*, 660 So. 2d at 696. The sentencing order states,

> The Court is obliged to consider any other mitigating circumstances that are relevant in determining the fairness of a life or death sentence and *the Court has considered those factors which are set forth as follows*:
>
> 1. *The evidence establishes that the defendant was abused as a child by his father and grew up in a dysfunctional family.* The evidence also established that the defendant's siblings were likewise abused and they apparently grew up to be responsible persons. Two of the siblings had the unfortunate experience of being compelled to testify against their brother. While there are doubtless numerous cases where the abuse received by children influence their actions in adult life and result in or contribute to criminal behavior. The Court does not find in this case that the abuse received by the defendant as a child is a mitigating circumstance.
>
> * * *
>
> The Court has considered and weighed each of the applicable aggravating circumstances and each of the

[33]

statutory and nonstatutory mitigating circumstances that are established by the evidence *or on which there has been any significant evidence produced* as they relate to the murder charge. Further the Court has *considered* whether the established facts are such that in *all fairness*, taking into *consideration the totality of the defendant's life or character* are sufficient to counter-balance the aggravating circumstances. The jury in this case was unanimous in recommending the death penalty. The Court has carefully considered and reviewed all of the foregoing as it relates to the murder charge and determines that sufficient aggravating circumstances exist to support the recommendation of the jury and that recommendation is not counter-balanced *by the mitigating circumstances*.

(emphasis added).

When analyzing Barwick's failure to consider mitigation claim, the Florida Supreme Court wrote that "the judge here recognized that the evidence established that Barwick was abused as a child," which the court recognized as "mitigating in nature" and "an appropriate circumstance for the court to consider." *Barwick II*, 660 So. 2d at 696. It also acknowledged that "the trial judge stated that he did not consider Barwick's history of child abuse as a mitigating factor," but nevertheless found that "the judge properly considered evidence of abuse in imposing the death sentence." *Id.* The Florida Supreme Court emphasized that the sentencing order stated the trial court had "considered and weighed each of the . . . statutory and non-statutory mitigating circumstances that are established by the evidence or on which there ha[d] been any significant evidence produced." *Id.* "This statement

[34]

indicates that the trial judge weighed the [child abuse] factor as ultimately required . . . [and therefore] sufficiently considered the mitigating evidence presented on this factor." *Id.* As Barwick points out, "extensive evidence was presented at Barwick's penalty phase regarding the abuse he endured at the hands of his father."

In light of these circumstances, the relevant question is whether it was objectively unreasonable to conclude, as the Florida Supreme Court did, that the trial judge considered Barwick's child abuse as a mitigating circumstance when it determined his sentence. *Id.* Keeping in mind that "[a] state court's application of clearly established federal law or its determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion," *Holsey*, 694 F.3d at 1257 (quoting *Harrington*, 562 U.S. at 101, 131 S. Ct. at 786), we cannot say the Florida Supreme Court's conclusion that the trial judge considered the abuse is objectively unreasonable when the order is read in its entirety, as the Florida Supreme Court did.

To be sure, the isolated statement on which Barwick relies is troubling to the extent it suggests that the trial court may not have given *any* consideration to the child abuse as mitigating because Barwick's siblings were also abused and "grew up to be responsible persons," or because Barwick's child abuse did not "result in or contribute to [his] criminal behavior." *Barwick II*, 660 So. 2d at 695-96. Failure to give *any* consideration to Barwick's child abuse for either of these

[35]

reasons would be contrary to clearly established federal law. *See, e.g.*, *Smith v. Texas,* 543 U.S. 37, 45, 125 S. Ct. 400, 405 (2004) (rejecting the notion that there must be a specific nexus between defendant's troubled childhood or limited mental capabilities and capital murder before allowing a jury to consider such evidence for mitigation purposes); *Eddings,* 455 U.S. at 114-15, 102 S. Ct. at 877 (holding a capital sentencer may not give relevant mitigation evidence "no weight by excluding such evidence from . . . consideration"). And the sentencing order could have been more carefully written to remove any ambiguity about the trial court's weighing process. For example, the trial court could have said something along the lines of the following: The Court does not find in this case that the abuse received by the defendant as a child is a mitigating circumstance *sufficient to outweigh the substantial and numerous aggravating factors*. But it is not appropriate for us to rewrite a state trial court's order or a state appellate court's reasoned opinion when evaluating them under § 2254(d).

The most that can be said for the sentencing court's order is that it is open to interpretation. That being so, even under pre-AEDPA habeas jurisprudence, we must give deference to the Florida Supreme Court's resolution of an ambiguity in the state trial court's order unless its resolution is not fairly supported by the record. *See Wainwright v. Goode*, 464 U.S. 78, 83–85, 104 S. Ct. 378, 381–82 (1983). Here, the Florida Supreme Court's factual determination that the trial

[36]

judge did consider and weigh Barwick's child abuse mitigating evidence is fairly supported by the record and thus entitled to deference.

Additionally, under AEDPA, we are also obligated to give the Florida Supreme Court's interpretation of the sentencing order the benefit of the doubt. *See Renicio v. Lett,* 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." (citations omitted) (quotation marks omitted)); *see also Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). Because the Florida Supreme Court's conclusion that the trial judge did, in fact, consider Barwick's child abuse as a mitigating circumstance did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d), Barwick's petition on this claim must be denied.

Finally in this regard, we are also mindful that the Florida Supreme Court concluded that "[a]ny error in articulating the particular mitigating circumstance was harmless." *Barwick II,* 660 So. 2d at 696 (citing *Armstrong v. State,* 642 So. 2d 730 (Fla. 1994) (per curiam)). We understand the court's citation to *Armstrong* to mean that any error in "the trial judge's articulation of how he considered the

[37]

mitigating circumstances and aggravating circumstances . . . was harmless beyond a reasonable doubt" because the five valid and weighty aggravating circumstances in this case strongly outweigh the nonstatutory mitigation submitted by Barwick during his penalty phase. *See Armstrong,* 642 So. 2d at 739. There is nothing objectively unreasonable about the Florida Supreme Court's alternative harmless error analysis based on the record in this case.

### D. Claim that Executing Barwick is Unconstitutional Because He is Mentally a Minor

Finally, Barwick argues that, while he was nineteen-and-one-half years old at the time that he killed Rebecca Wendt, he presented expert psychological evidence at his post-conviction proceeding that his mental functioning was equivalent to that of an ordinary 11-to-13-year-old person, and his intellectual functioning equivalent to that of an ordinary 12-to-14-year-old person. Thus, he asserts that "[w]hen one considers mental capacity and level of functioning, there is no sustainable rationale for imposing the death penalty [here] . . . and not upon the class of individuals outlined in [*Roper v.*] *Simmons*[,543 U.S. 551, 568, 125 S. Ct. 1183, 1194 (2005)]. *See, e.g., City of Cleburne, Texas, et al. v. Cleburne Living Center, Inc., et al.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person

[38]

within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.").""

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The provision is applicable to the States through the Fourteenth Amendment. *Furman v. Georgia*, 408 U.S. 238, 239, 92 S. Ct. 2726, 2727 (1972) (per curiam). The Supreme Court has looked to "evolving standards of decency" to guide its determination of when the imposition of a particular punishment would be "cruel and unusual." *See Trop v. Dulles*, 356 U.S. 86, 100-01, 78 S. Ct. 590, 597-98 (1958) (plurality opinion).

In *Roper v. Simmons*, the Supreme Court held that the imposition of the death penalty on those less than eighteen years old would be "cruel and unusual," in violation of the Constitution. 543 U.S. 551, 568, 125 S. Ct. 1183, 1194 (2005). The Court rested its holding in part on the fact that several differences exist between juveniles and adults. These differences include a lack of maturity, an underdeveloped sense of responsibility, a greater susceptibility to negative influences and outside pressures, and the fact that juveniles' personality traits are more transitory and less fixed. *Id.* at 569-70, 125 S. Ct. at 1195-96.

But even if we were to agree with Barwick that sentencing to death one who has reached the chronological age of legal maturity but who possesses the mental

[39]

and intellectual capabilities of a juvenile would be unconstitutional,[14] we can grant relief only if the state court's denial of his claim was contrary to or an unreasonable application of clearly established Federal law.  Although the Florida Supreme Court denied this claim as procedurally barred, it nevertheless evaluated Barwick's claim on the merits, stating,

> [T]he [Florida Supreme] Court has expressly rejected the argument that *Roper* extends beyond the Supreme Court's pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the eighth amendment. *England v. State*, 940 So. 2d 389, 406-07 (Fla. 2006).  Moreover, the [Florida Supreme] Court has previously denied relief on each of the specific claims raised by Barwick. *See Hill v. State*, 921 So. 2d 579, 584 (Fla. 2006) ("Hill's third claim is that his mental and emotional age places him in the category of persons for whom it is unconstitutional to impose the death penalty under [*Roper*].  This claim is without merit.  *Roper* does not apply to Hill.  Hill was twenty-three years old when he committed the crimes at issue.  *Roper* only prohibits the execution of those defendants whose *chronological* age is below eighteen.").  Here, Barwick was nineteen and one-half years old when he committed the murder.  Accordingly, we deny relief upon these claims.

*Barwick IV*, 88 So. 3d at 106.

Setting aside Barwick's procedural default, the district court also addressed the Florida Supreme Court's resolution of the merits of his claim:

---

[14] To be clear, we do not express any opinion as to the validity (or lack thereof) of Barwick's contention.

[40]

The United States Supreme Court has not extended *Roper* to mental or emotional age. The Florida Supreme Court's rejection of Mr. Barwick's claim thus was not contrary to "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *See Dombroski v. Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008) (holding that a state decision on an issue cannot be contrary to federal law under § 2254(d)(1) if there is no Supreme Court decision on point).

The Florida Supreme Court's rejection of Mr. Barwick's claim also was not an unreasonable application of *Roper*. In *Roper*, the United States Supreme Court Case drew a bright line—age 18. The Court squarely held that executing a defendant for committing a crime before age 18 is always unconstitutional, no matter how mature the defendant. A reasonable application of *Roper* is that the bright line works the other way, too—executing an individual for committing a crime after age 18 is not, just because of age, unconstitutional. Mental or emotional age may be a mitigating factor, but it does not necessarily preclude the death penalty.

Because the Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, Mr. Barwick is not entitled to relief.

We agree with the district court's analysis. We note with regard to whether a state court's application of federal law is unreasonable that this Court has clarified that state courts are not obligated to extend legal principles set forth by the Supreme Court because AEDPA requires only that state courts "fully, faithfully and reasonably follow legal rules already clearly established by the Supreme

[41]

Court." *Hawkins v. Alabama*, 318 F.3d 1302, 1307 n.3 (11th Cir. 2003). Accordingly, we cannot say that the Florida Supreme Court's opinion was an unreasonable application of federal law when it considered this claim.

## IV.

For the foregoing reasons, the district court's order denying Barwick's petition for habeas corpus is **AFFIRMED**.

[42]